Good morning, Your Honors. My name is Tom Woodbury, and I represent the appellants in this case. I'm going to introduce the court. We're going to wait until they're done getting through here, and we're not going to take away your time. Okay. This is my twelfth case arguing before the circuit court on species viability claims in a forest plan context. And I dare say that of all of those 12, this is probably the simplest of all the cases. I'm relieved. I'll try to prove that in spite of the briefing. All of these cases begin with a very fundamental question. What did the Forest Service tell the public that it was going to do when it adopted the forest plan to ensure species viability? In every instance, including this one, they designate indicator species for different types of habitat. And here we're concerned with old growth habitat. Counsel, with respect to that, let me ask you this question. The Forest Service undertook in the forest plan to do annual surveys of this indicator, right? Yes. They missed a few years, right? They really never can make that up, can they? Yeah. You know, I can't go back and do what they were supposed to have done two years ago or three years ago or five years ago, right? That's correct. So if you prevail, really what they have to do now is a new forest plan and then a new EIS, right? Is that really what you're asking us for? No, Your Honor. What they would have to do is amend the forest plan in light of the failure to implement it to adopt a new strategy and their own rules. They attempted to do that after the fact. And you objected to that, too. They never attempted to amend the forest plan. Well, I can't just operate off the forest plan. They're required to follow the forest plan. If it's no longer valid, if there's something wrong with the forest plan and it doesn't make sense anymore, then they need to fess up and amend it. Propose an amendment, involve the public. Discuss what type of new strategies you're going to do, what you can do to compensate. But basically that's what they have to do or they're never going to sell these logs, right? No, they have to adopt a new strategy for ensuring the viability of these species. It's taken 10 years already. How many more years is it going to take? Well, actually, they're already in the process of revising the forest plan here and everywhere else in the country because these forest plans. How many more years is it going to take? I'm just curious. To revise. To start cutting in two years? Yes, two to three years. How many appeals do you include in that? Appeals of the, no, there's just a, there's no appeals until they've made a final decision. Let me just get. Even then they can implement it. If they're revising the, okay. Let's say that you are correct on the goshawks that they didn't follow the plan in terms of the monitoring and that sort of thing. So if that's true, then they have to have a new plan. But they're already making a new plan, correct? Yes. So why wouldn't we suspend this case since if they're making a new plan and they already have the continuing obligation for monitoring, presumably under the existing plan, what value would it be to have this case go forward if they're going to have a new plan anyway, which may or not be sufficient for the protection? Your Honor, I mean, essentially that's the relief that we're seeking is, you know, that the strategy that they agreed to implement, they're no longer implementing. They're no longer following their forest plan. And until they either amend the forest plan in a specific way. When you say they're no longer following it, aren't they, is there any evidence, I mean, there's evidence maybe of some missed monitoring and some that was not published but that was undertaken. But if they're going forward with the monitoring, I'm just trying to find out as a practical matter what's going to happen. Well, as a practical matter, the Forest Service has told this Court that from their standpoint, they have at least as of 2001, I think, that they have four years of consistent monitoring. Right. So assuming that they continue to monitor consistently, they would now have eight years of consistent monitoring. That's certainly enough monitoring, from my understanding, to make a call on trends. They would have to adopt a new EIS then now before they let the log-in contracts? The EIS in this case is definitely defective. They could do a supplemental EIS. A supplemental? Yes. They're not required. I mean, you know, they would tier it to the old EIS. Well, that's what they attempted to do, didn't they? I know. Well, okay. Go ahead. Well, let me along these lines just because I read all this, but then I try to figure out what it means. Okay. So I have some concerns about being able to come in with Mr. Whitford after the fact and explain everything. Because he did explain. If he's right, he explained it to me. But he just didn't do it in the ROD and during the appropriate time. So let's just say for talking purposes that we couldn't consider his affidavit and that from the record, it's unclear whether they're applying the 5 percent to commercial or to everything or to some other definition. We just don't know. Okay. So we say, okay, you win on that. Then they go back and they supplement the record in the administrative proceeding with Mr. Whitford and maybe some additional stuff that makes it even clearer. Correct? Yes. And if, in fact, Mr. Whitford, we assume he's telling the truth, and they are, in fact, taking it off of the commercial, although maybe there's more commercial than you imagined, then where are you? I mean, basically, Mr. Whitford gets incorporated in the EIS and we're sort of right where we are today, right? No, actually, Your Honor, we're right where we were in 1986 when the Forest Service apparently misled us. That's worse. Well, let me explain that. Okay. Because it's a critical point. In addition to the monitoring issue, to me, this is more critical. Okay. You know, it's very clear from the record that when they adopted the forest plan and they had this 5 percent standard, the public said, 5 percent, that's not enough. We've got 10 percent up here. You know, that doesn't sound like that's enough to ensure viability of old-growth species. And the Forest Service said, no, no, no. We're not just going to maintain 5 percent of the forest as old-growth habitat. We have an 80 percent of the forest is in reserve where old-growth habitat is going to be allowed to develop naturally and that there's enough old-growth habitat in there, we believe, already to satisfy the needs of these species. We're only talking about that 20 percent of the forest where we intend to do commercial logging. There we're going to maintain 5 percent of what's there or 5 percent of the forest in order to maintain connectivity. Now, the Whitford Declaration comes out and says no. Actually, 50 percent of the forest is open to logging and 50 percent of it is not. And most significantly, I believe that's page 127 of the record, in his declaration he says, and old-growth, by definition, is always going to fall into the 50 percent of the forest that is open to commercial logging because it has the potential to generate greater than 20 cubic feet per acre per year of wood fiber. So now, all of a sudden, they go back to supplement the EIS, as you would say, and they say, well, actually, we don't have any old-growth reserves. We only have old-growth in 50 percent of the forest, and we're going to reduce that down to 5 percent in those units so that forest-wide there will only be 2.5 percent old-growth habitat. And believe me, Your Honor, the public will have quite a bit to say about that because their old-growth indicator species happens to require 20 percent old-growth habitat well distributed in the forest. So what they're attempting to do in litigation is completely in apposite to what they told the public they were going to do in 1986. It's a complete diametrically opposed strategy. And if that's the strategy that they've been following for 20 years without informing the public through a forest plan amendment, then we have some very significant concerns and suspicions about why they're not finding any goshawks in 64 miles. Let me pursue that just a little bit. Leaving aside definitional points, they have to have 5 percent of the commercial forest lands within an individual timber department. Is that correct, under the plan? 5 percent commercially, yes. Right. And so that's the language of the plan. Does the plan itself set out this 80-20, or is that in background to the plan? It was in response to the public's comments on the draft. I saw the commentator's response. So what I'm trying to understand there is the binding effect one way or the other. If the plan, the commentator says, look, I don't think it's going to be a problem because it's 80-20, but that the plan itself doesn't say anything about that. The plan just says 5 percent of X. Are you challenging the failure to incorporate the commentator's comments into the plan? Are you challenging the plan? What is the final decision that you're challenging? The reinterpretation. 5 percent, so I can understand that. Yeah, it would be the reinterpretation of that 5 percent standard. It was the supervisor, by the way, that responded to those comments through the EIS process. And so the public was asking, what is the science supporting 5 percent as a minimum standard? And the supervisor said, oh, don't worry, that's not the standard, and we're not saying we're only going to maintain 5 percent, and this is how we're going to apply the standard. So now we're being told, no, that's not how we actually apply the standard. We apply it this way. Well, if that's the case, then they should have responded to the public's comments about the 5 percent standard. So you could say, if you wanted to get technical about it, the EIS underlying the forest plan is inadequate because they never explained to the public the science supporting that strategy, and it's an imbalanced strategy. So just to be clear, though, what you appealed, the decision you appealed from, is the forest plan? No, it's the decision, well, actually, we didn't get the interpretation. It came in litigation. But the interpretation that they're giving us now about how that standard is applied, it's that interpretation that we're saying is inconsistent with representations to the public about what that standard was. What's the final decision that we find that interpretation in? Well, unfortunately, they didn't explain this in the EIS, so it's in the Whitford Declaration. You know, I mean, if they don't demonstrate compliance with the standard in the EIS, then, you know, that was one of our biggest. So you're basically saying it's the absence of this being incorporated in the EIS? Yes. I mean, we make, there's different levels of this case. Our first, most fundamental level is they didn't demonstrate compliance with the standard in the EIS. So Neighbors of Cuddy Mountain says they have to go back and do that. Right. But we're just trying to show that it's not a movement. Yeah, we're talking about the 5% here. We're talking about the. Yes. And the other point on that that I would like to, is that our, you know, when he said 5% of the 20% and 80% reserves, there's that table that they're relying on now. And what we've said is you can interpret that consistently with that table. What he was talking about was equating, for purposes of old growth standard at least, he was equating suitable habitat and commercial logging and unsuitable and noncommercial. So he wasn't being inconsistent. It wasn't like the supervisor didn't know what he was talking about or referring to. And instead now they're saying, well, for purposes of fire, I guess, you know, commercial means this. Well, we're here for old growth species viability. And for purposes of old growth species viability, 20% as suitable is commercial and open to logging. And the 80% is reserves. So, you know, like I say, they didn't explain that in the EIS here or in any other EIS anywhere else. You know, they explained the opposite in the EIS for the forest plant. It's come up in litigation. And if that's going to be their position, then they shouldn't be asking judicial deference for it without first floating it to the public in a public forum where we can comment on it and have expert, you know, experts within the agency and our own experts come and say that's not. Now, in the goshawks, though, it seems like it's kind of a catch 22. They have the Forest Service takes position that they can go forward with this project because there aren't any goshawks there. And you say, well, because there's none there, then they're not making it viable. But if there were some there, you would also say you can't go forward either. Right. So whether they're there or not there, you your argument is that the project shouldn't go forward. Right. No, there's no goshawks are not the type of species that cannot tolerate any logging whatsoever. They in this case, we don't believe they can tolerate any further depletion of all growth habitat in that drainage. But that doesn't mean that they could. I mean, that's 12.6 percent of the project. That doesn't mean they couldn't log the other stuff depending on the other variable needs of the goshawk. No. But what we're saying is the problem with the argument of the Forest Service saying, you know, there's no goshawks in there. So obviously we can't impact them. Well, what about cumulative impacts? What about the fact that you've been logging in this drainage, the 60 square mile of the part of the forest for decades? You know, where's the cumulative effects analysis? Impacts includes past logging, too. So is it because of past logging that there's no goshawks in there? Well, they never even analyzed that. They never even – they just said, oh, there's no goshawks, don't worry about it. And obviously we're worried about it because that's the indicator for old growth. They say there's so much old growth in there that they can continue logging it. So that makes us think maybe your assumptions are wrong. Thank you. Did you want to save time for rebuttal? Good morning, Your Honors. May it please the Court. My name is Todd Agard. I'm here representing the Forest Service. This appeal is about two questions, both having to do with compliance with the forest plan. The first is whether the Dry Fork Vegetation Restoration Project complies with the forest plan's old growth standard. The second is whether it complies with the goshawk viability monitoring requirements. As to the old growth standard, as I think is clear from the comments from the appellant's argument, this is really a question of how to measure compliance with that standard. And the standard is found in the supplemental excerpts at page 132, and it requires 5% old growth for commercial forest lands for each timber sale compartment. There are four timber compartments in the project area, and all of them have percentage old growth that's well in excess of the 5% standard. So I think compliance with the standard is well established on the record. In the forest, where is old growth trees necessary for the habitat of the hawk? I'm not sure. The old growth is distributed. When you have foresting, it's strip foresting. You strip away all the trees. No, that's not the type. There is very little bit of that type of timber. Isn't that where the old growth timber, 5%, needs to be preserved? It doesn't need to be preserved in the forest that isn't harvested. There really is not that. There is very little of that clear-cutting type harvesting that you're thinking about going on here. This is a vegetation restoration project. Why was it so explicit in the plan that you preserve 5% in the timbered territory? But there's no question on the record that the Forest Service is doing that. You would ask about clear-cutting, and what I was pointing out is that in a vegetation restoration project like this, it's mostly prescribed burns and thinning. There's very little of the type of timber harvesting that you're thinking about going on here, and even less of that timber harvesting is going on in old growth areas. There is some old growth being impacted. About 4.7% of the old growth in this project area is going to be impacted. I'm sorry, about 4.7% is the percentage of goshawk habitat, so I misspoke slightly there. But going back to the question of compliance with the old growth standard, the Ecology Center makes three points about compliance with the standard. The first is that they point out that the percentage is supposed to be a percentage of commercial forest, whereas the EIS reported it as a percentage of all forest. But as the Forest Service has explained and the Ecology Center has not rebutted, they really are ñ they mean the same thing here. So they've explained it in Mr. Whitford's affidavit? That's right. And Your Honor expressed some reservation about relying on it. A lot of reservation because I can't get that from reading the administrative record. Well, it is a technical explanation, but if you look closely at Mr. Whitford's declaration, he relies entirely on material that is in the record. He might, but you couldn't divine it without him. Without his help. Yeah, apparently. I mean, you know. That might be true. The things are hard enough to read anyway, but I just don't see how we can bring in ñ he's not like just putting things in tables. I mean, he's moving stuff around, he's putting a gloss on things. So I don't know what the authority is to have that supplement to the administrative record. I think all the data and all the analysis is in the administrative record. But in any event, I don't think the court really has to reach that because what happened here is that Whitford was responding to Jewell's declaration. The criticisms that the plaintiffs had raised about commercial force versus all force were raised for the first time in litigation in the Jewell declaration. Now, I think the district court could have said, we don't do that. We rely on the administrative record. We rely on the comments that you raised and the Forest Service responses. Instead, the district court decided to say, okay, I'll look at what the Ecology Center has to say through its declaration and how the Forest Service responds to that. It was being more generous to the Ecology Center, I think, than it really had to be because the Ecology Center was raising its criticisms for the first time during litigation. I don't think it would be fair for this court to say that the Ecology Center can raise its allegations in a declaration raised for the first time in litigation and the Forest Service can't respond if it was. But it doesn't. I thought it raised in its briefing. I mean, it has the declaration, which is kind of icing on the cake. The point would be that I think. They're basically saying, look, here's the problem. We don't think that you've complied with the 5 percent standard. That's the challenge. That is the challenge. But the specific problem that they've now identified was not until litigation. And what I would say is if they're allowed to wait until the litigation to raise their allegation, then the Forest Service can only respond. Unless they couldn't fix it in the administrative process. Excuse me? The Forest Service couldn't fix it in the administrative process because it was a legal problem. Exactly. I mean, that's the whole essence of the Vermont Yankee framework that the Supreme Court has set up, is that the whole public involvement is a give-and-take process that's supposed to happen during the administrative proceedings. If it happens in litigation, either exclude it entirely or, I think, do what the district court did here, which was give both sides some leeway to expand on the administrative record. But I think it would be fundamentally unfair to the agency to allow the plaintiffs to raise their allegations during litigation and not allow the Forest Service to respond. And I think it's also important here that you don't really have a question as to whether the Whitford's explanation is accurate. The Ecology Center has made no attempt to say that it's wrong or say that they have contrary data or disagree. Then the final point as to the- What is commercial forest land within a timber compartment? What does that mean? I'm glad that you asked. There's two terms that have been tossed around here, commercial forest land and suitable forest land. Within? Within the timber compartment. A timber compartment is just- That's very important, that word within. Yes, it's just a unit of analysis. You're going to make the calculation for each timber compartment separately rather than looking at some other unit of analysis. The timber compartment is the geographic unit of analysis. The numerator is old growth. The denominator is commercial growth. It isn't the timber compartment that's important. It's the commercial forest land within that timber compartment. That's right, and that's what I was about to explain. That's where trees are going to be cut down. No, no. Commercial forest land doesn't mean you're going to cut down trees? No. If I could point the Court to pages 150 and 153 of the supplemental excerpts, this is laid out very clearly. Commercial forest land is what land could the Forest Service is sort of biologically available for timber harvesting. It's a lot of forest area. Then suitable forest land is as part of the planning process, the Forest Service goes in and says, what of these lands are actually are we going to make as part of the planning process lands that we designate for timber harvest activities? It is a subset of commercial forest lands. Commercial forest lands, one way to think of it is sort of hypothetically available for timber harvesting, whereas suitable forest lands are the subset that the Forest Service says we're going to actually plan as part of our process. I don't understand your hypotheticals. I'm talking about concrete words in a plan. I'm not talking about anything hypothetical. Right. And what I would say is what you're talking about is concrete plans that the Forest Service said, let's do timber harvesting in that area. That is suitable forest land. Commercial forest land is a much broader category. And the 5% applies to the commercial forest land that would be potentially available for commercial. That's right. And that's just the way the standard is raised. Now, maybe Ecology Center wishes that it was different. But if you look at the definition on page 132 of the supplemental excerpts, it's phrased as commercial forest land, not suitable forest land. And what Ecology Center has gone and done is they've gone back to two places in the record where they say that the Forest Service is conflating the two terms. But if you look, neither of those areas really withstand the explanation that they've offered. As we've explained in our brief, I'm happy to go into a detail of explanation. The Court was asking a little bit about these response to comments. I think these response to comments have just simply been misinterpreted by the Ecology Center. The 2080? Excuse me? The 2080 response? The 2080 response, there's two layers that the Forest Service was talking about there. One is that there's the 5% old growth standard. And then the Forest Service was saying on top of that, 80% of the forest isn't even going to be areas that are designated for timber harvesting. So there's two layers. The Forest Service was not saying the 5% applies only to the 20%. The Forest Service was just pointing out with these two layers of protection to forest, it felt that that was adequate. Now, I understand that Ecology Center has a different understanding of what that response to comments said. But if you looked at what the actual old growth standard is, which on page, again, 132 of the supplemental excerpt, I think that has to control. And in any event, it would be if the response to comment is subject to more than one plausible interpretation, certainly the Forest Service is entitled to rely on its own explanation. Commercial forest land means places where it's permissible to cut down trees for commercial purposes. Not really because What does a commercial mean? That's what I'm saying. It would be available for the Forest Service to designate through the planning process. But the Forest Service has said through the planning process, we're not going to designate all of that. So it's not really available for timber harvesting. It's just at one stage, it's sort of pre-planning it was available. But because of the planning process designates only a subset, the planning process has reduced the amount of area that really is available to timber sale projects and timber harvesting projects. I see that my time is about half up. I think I'll move on to the viability unless the Court has any questions about old growth, more questions about old growth. I think the first important thing about goshawk viability is to point out is that goshawks are not endangered or threatened. This is not a species like the lynx, which was actually one of the focus of this vegetation restoration project that the Fish and Wildlife Service has determined is in danger of being threatened or extinct. The second important thing is that there are no known goshawk territories within the area being impacted by the project. And that finding is found in the Supplemental Act Service, page 9. The second is that the Forest Service didn't stop there. They didn't say, we're not affecting known territories, so there's not going to be any impact. What they said is, okay, but there's potential habitat, and we have to have some concern about potential habitat, because if we're sort of wiping out the potential habitat in the area, that might inhibit goshawk from entering the area if they want to. But what the Forest Service looked and said is that only 2.2 percent, a minuscule percentage of the potential habitat in the project area is even going to be impacted. I thought that the Ecology Center was saying, though, that by missing some of the monitoring, that you can't really give those conclusions with any assurance. I think that accurately represents the Ecology Center's argument. I think Mr. Woodbury very accurately stated it. They have a scientific disagreement with the Forest Service. What he said today is four years wasn't enough, which four years was the amount of data they had at the time they made the decision here. But since then, there's been another four years. He thinks eight years is enough. He's entitled to have that opinion, but the Forest Service is entitled to rely on its experts. And what its experts told it is that based on the four years of data we have, it's relatively stable over the period of that four years. We think that's sufficient to make an analysis. And that's precisely the type of thing that the Supreme Court has said again and again. That's a scientific disagreement where the agency is entitled to weigh the evidence and rely on its own experts. It's not obligated to adopt the criticisms that are leveled at it by other parties. So even if the Forest Service itself, if the plan said annual monitoring? Sure. The Forest Service said we're going to attempt to do annual monitoring. And I think the Forest Service has been quite forthright that it didn't immediately do that. It's only been since 1997 that it really has reliable data. The question then is, at one point after 1997, could the Forest Service look back and say, now we have enough data that we can make an informed decision about DOSOC populations based on this data? The Forest Service ecologists, the interdisciplinary team said, we think four years is enough. The Ecology Center has said, we don't think four years is enough. We think eight years is required. It's a disagreement. But I think that's how the Forest Plan, that we don't need to amend the Forest Plan because we're not at a point where there still isn't enough data. It's just a question of how many years do you need the Forest Service is entitled to exercise its judgment as to how many years were needed. If we were to decide that this 5 percent is a total mess right now, and to agree with Ecology Center, what would happen as a practical matter? I think, Your Honor, If we were to say we can't take Mr. Whitlow's, is that his name? Whitford. Whitford, Whitford. We had a Whitlow earlier. Whitford's affidavit. We'd like to, but we can't. Then what would happen? I think, Your Honor, pretty much pointed out exactly what would happen. It gets sent back to the agency. The agency makes the Whitford's declaration part of the record, and it goes right back up again. Same exact issues, same exact arguments. How does the Forest Service go about modifying the plan? I'm sorry. How does the Forest Service go about modifying a plan? The plain words of a plan. There's two ways. One is it can do a plan amendment. Yeah. Or it can issue a new plan. You have to have public hearings. Excuse me? You have to have public hearings. I think there is public comment depending on the significance of the plan amendment. Well, how about in this case? This is very significant. No. Here the Forest Service is not saying we're going to change the plan to make it okay. The Forest Service is saying we complied with the plan. You're changing the wording of the plan. No. The Forest Service is not arguing that they changed the word of the plan. Ecology Center is arguing that we're not complying with the plan. So just to be clear, there is no the Forest Service, the Forest plan may eventually change, but that's not what's at issue in this case. What is at issue in this case is the Forest plan, as written before the court, has the Forest Service complied. We say that we have. Ecology Center says that we haven't. So finally, I think the other sort of scientific disagreement. Let me ask you, if it went back, how would the 80-20 issue get sorted out? Well, part of our problem with the 80-20, as we point out in our brief, is that Ecology Center hasn't identified any nexus between the 80-20 and this project. If you look at their brief, what they say is this interpretation, this Forest Service has changed its interpretation, and this interpretation will allow 500,000 more acres of logging in the forest. They haven't said this project affects those 500,000 acres. They haven't said anything about this project with respect to this 80-20 mix. I think that what they might – to be honest, it's difficult to determine exactly what some of their arguments are. But as I can divine it, I think that they're trying to use the 80-20 mix to go back and interpret what commercial forest lands mean, saying that using this 80-20 number, that shows that commercial forest equals – There's a dispute over what commercial forest means. I think that's right. And I think that the easy answer to that is the forest plan defines those terms. That has to control, not their obtuse reading and tea-leaf reading of response to comments and the response to a FOIA request. I think that they've sort of talked about everything but the actual definition of those terms in making their argument. I just wanted to make one more point about – I think the other sort of scientific disagreement that we have in the record is about whether the requirement or the plan of monitoring known territories is an adequate basis on which to make a viability determination. And I think the problem there with the Ecology Center's argument is twofold. First is that it really is just a scientific disagreement with the Forest Service's judgment. The other is that the Forest Service follows the Forest Plan, and the Forest Plan says you monitor viability for the GOSOC by looking at known territories. So the Forest Service is just doing what the Forest Plan required. Now the Ecology Center can come in and say, hey, here's this other study that we interpret to say you should do something different, but surely a scientific study, no matter how accurate, doesn't supersede the terms of the Forest Plan. And the final point that I want to make is that the Ecology Center talks a lot about nests that aren't active and they ascribe significance to that to show that – to conclude that maybe GOSOC populations are declining or that something has happened to these GOSOCs. But if you look at the record, at the science of the GOSOC, what happens is that GOSOCs have a series of, I think, two to four nests in their area that they rotate from, from year to year. So it would be fully – and the Forest Service's monitoring of the known territories has found roughly about 30% active territories. And what I think read hand-in-hand, what that shows is that those are entirely consistent, that it would be perfectly appropriate to find more inactive territories than active territories in a particular year because the GOSOCs are just moving from nest site to nest site. So there's nothing alarming about the 30% number that the Forest Service has found. I think I've made the point about that the scope – this Court's standard of review is deferential and that you don't step in and resolve scientific disagreements. In summary judgment, we're deferential? Well, that's – you know, that always – you are not deferential to the district court. You are deferential to the agency. That's because the – I'm not relying on the – It's an APA case. It's an APA case, so you defer to the agency. It is a summary judgment case as well, so you don't need to defer to the district court, except on the abuse of discretion issue as far as letting in the wit for a declaration. What I would leave this Court with is to look back and look at the record of decision in this case because I think it shows two things that are rather important. The first is that this project is really a vegetation restoration project. It is not a timber harvest project. It is not a cut-to-trees project. The second thing is that I think the impression that you're left with when you read the record of decision is an important one. It's that the Forest Service has a rather thoughtful explanation for why it's embarking on this project, and it explains very thoroughly in the record of decision how public input throughout the administrative proceedings caused it to change its mind and to change how the project looked based on that public input. I think that's the model that the APA sets up, and I think it would be really rather discouraging for the process that's happened in this case of criticisms not raised until litigation to be allowed to subvert that. If the Court has any further questions. I think there's nothing further. Thank you. Thank you very much. Mr. Woodbury. First, I need to correct something that counsel said about 30 percent occupancy rate of territories, and he said that's because they go from nest to nest. Those nests are in the same territory. In fact, they're in a small area called the post-fledgling family area, which is a 420-acre area within a 5,000-acre territory. So to say, oh, 30 percent, you know, 70 percent of the territories are not occupied is because they're in Florida or something like that is not true. They should come back to the same territory. They're very loyal to their territories, even if there's not enough, you know, prey to support fledglings, but they have alternate nest sites in that area. So it is a concern when there's only a 30 percent occupancy rate. How are the offspring going to find each other, assuming those 30 percent are even producing offspring? He also said, you know, four years of, and I sort of conceded that for the sake of argument, that four years of consistent monitoring should be enough to establish a trend. So where is the trend? Where is the analysis of the viability of the goshawk in the Lewis and Clark National Forests? It's not in the EIS. The experts said, oh, we can't do this in a site-specific EIS because you have to determine viability at a forest-wide scale, not at a scale of a 40,000-acre drainage. Okay, so tier the analysis to the forest-wide viability study that you've done. Well, there isn't one, so it's not tiered to anything. There's nowhere in the record where you will find a discussion of what these populations, supposed populations and productivity rates mean concerning the viability of the goshawk. There's lots of science on that. The forest has done it in other forests, like the Kaibab and the Black Hills, et cetera. They can do it. They've just never done it in the Lewis and Clark. And on top of that, they don't have a habitat proxy. They don't know how much old-growth habitat is in the forest because by their lawyers' own arguments, they never adopted a habitat proxy for population trends. So you don't have the habitat proxy like you do in all the other cases this court has decided. So what did the court say in Lance Counsel v. Powell? Well, if you don't have ñ in that case, it was an inadequate proxy. The habitat data was not reliable as opposed to just missing. But the court said, well, if you don't have that, then you better be able to tell us what the trends are because that's what the law requires. We're the only circuit in the nation that allows the Forest Service to get off the hook when they don't have that if they've got good habitat data. They don't have good habitat data here. They don't have any population trend data. They've never done a study of goshawk viability in the Lewis and Clark National Forest. So the fact that there's no goshawks to be found, the indicator for old-growth habitat, and this 60-square-mile drainage indicates that they better take a hard look at what's going on. And that's what they don't want to do because they're afraid that it won't allow them to continue to deplete old-growth habitat. Oh, the comment about the lynx. You know, the lynx was a ñ like the goshawk, the lynx was a sensitive species prior to being listed as a threatened species. And the whole point with sensitive species like the goshawk is that you should go the extra mile, as this court has said in Inland Empire, to make sure that they're viable so they don't end up on the threatened and endangered species list. And so if the Forest Service doesn't do their homework and just continues to assume everything's okay, you know, 10 years from now we'll be talking about the goshawk as a threatened species, and they'll be saying, you know, the three-toed woodpecker is not a threatened species or something. I mean, you know, that's a disingenuous argument. They have to protect them now so they don't become threatened. And by the way, one of the main reasons that the lynx was listed was because of Forest Plan implementation. That's all I have. Thank you very much. Thank you very much. Thanks to both counsel. I just might add, because both of you do a lot of ñ the Department of Justice is here a lot, and Mr. Woodbury, you're here a lot. Sometimes it's helpful in the briefs if you would provide a glossary with the acronyms. We know what MIS is, but as you can see, we have four different kinds, or three big environmental cases today, and the acronyms in each of the acts are a little different. So sometimes I just ñ you don't have to, but just a suggestion that a little glossary goes a long ways in helping us out. So on both sides, thanks very much. The Ecology Center v. Powell is submitted. In the brief. Yes. All rise. This court for this session stands adjourned.
judges: Ferguson, Beezer, McKeown